USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 3, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

JUDITH H. PANZER-SENZER, as
Administrator of the Estate of RICHARD
FRED PANZER,

                 Plaintiff,

          -v-

NEW YORK STATE OFFICE FOR PEOPLE
WITH DEVELOPMENTAL DISABILITIES,
JANE AND JOHN DOE(S) 1-10,

               Defendants.

------------------------------------------------------------X

17-cv-1086 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On February 13, 2017, plaintiff Judith Panzer-Senzer ("Panzer-Senzer" or "plaintiff") filed this lawsuit as administrator of her brother, Richard Panzer's ("Panzer"), estate. Plaintiff seeks relief under § 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Claim I); 42 U.S.C. § 1983 for violations of Panzer's Fourth and Fourteenth Amendment rights (Claim II) as well as his substantive due process rights (Claim III); and state common law claims of, inter alia, negligence and infliction of emotional distress (Claims IV-VI).

Pending before the Court are two motions to dismiss filed by defendant Office for People with Developmental Disabilities ("OPWDD"). (ECF Nos. 11, 15.) Together, the two motions seek dismissal of all six of plaintiff's claims as to OPWDD. For the reasons set forth below, those motions are GRANTED.

## I.    BACKGROUND

The factual allegations below are drawn from plaintiffs' First Amended Complaint, (ECF No. 10), and presumed true for purposes of this motion.

Panzer, whose sister brings this action as administrator of his estate, was a developmentally disabled senior citizen who had the "mental functioning capacity of a young child."  (Am. Compl. ¶ 7.)  He could not read or "make complex or adult decisions" and required "close supervision at all times."  (Id.)  Panzer had resided in a facility licensed by OPWDD since 1958, when he was about twelve years old.  (Id. ¶¶ 1, 11.)  He lived there until 1990, when he transferred to Pearl River Community Center, where he resided until he became ill in October 2015.  (Id. ¶ 11.)

On October 15, 2015, Panzer was taken to Nyack Hospital and diagnosed with pneumonia.  (Id. ¶ 12.)  He stayed there for a week and then spent just under two months in physical therapy at Northern Manor Multicare Center.  (Id.)  On December 11, 2015, Panzer was transferred to Mount Ivy IRA, an OPWDD facility, where he allegedly "received the worst care possible."  (Id. ¶¶ 12-13.)

Panzer-Senzer claims that at Mount Ivy, her brother was "deprived of food, water, medical treatment, hygienic care, and basic human decency," and that he was "inhumanely allowed to sit, bed ridden, for days without activity, physical therapy, medical care, or changing of soiled undergarments."  (Id. ¶ 13.)  He allegedly became "gravely ill" after this "deliberate indifference to his medical condition" and was transferred back to Nyack Hospital on December 21, 2015.  (Id.)  One day later, Panzer died.  (Id.)

At the time of Panzer's death, according to the Amended Complaint, his "undergarments were so soiled with feces and human waste that they had fused to his skin. The attempt to remove the decaying undergarments caused his skin to tear. He was malnourished and dehydrated . . . ." (Id. ¶ 14.)

On February 13, 2017, Panzer-Senzer initiated this action as the administrator of Panzer's estate. She alleges that OPWDD was supposed to "ensure [Panzer's] care and ensure that safe practices were administered by staff at Mount Ivy." (Id. ¶ 15.) She further asserts that defendants were "clearly aware" of Panzer's "mental incapacity which prevented him from demanding proper care, food, water, and medical treatment," and that they "knew or should have known about the deplorable care."

## II.   LEGAL PRINCIPLES

### A.   Pleading Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must provide grounds upon which their claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "'enough facts to state a claim to relief that is plausible on its face.'" Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550

U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In applying that standard, the Court accepts as true all well-pled factual allegations, but it does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. Furthermore, the Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). If the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate. Twombly, 550 U.S. at 570.

B. Eleventh Amendment Immunity

The Eleventh Amendment to the U.S. Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI; see also Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996). Over the course of the Amendment's history, it has come to mean "first, that each State is a sovereign entity in our federal system; and second, that '[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.'" Id. (quoting Hans v. Louisiana, 134 U.S. 1, 10 (1890)).

4

However, under some circumstances, Congress may through legislation abrogate the States' immunity from suit. "In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity'; and second, whether Congress has acted "pursuant to a valid exercise of power." Seminole Tribe, 517 U.S. at 55 (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)) (alteration in original). Congress's intent to abrogate must be "obvious from 'a clear legislative statement.'" Seminole Tribe, 517 U.S. at 56 (quoting Blatchford v. Native Village, 501 U.S. 775, 786 (1991)). And Congress's exercise of power is valid if the legislation in question was "passed pursuant to a constitutional provision granting Congress the power to abrogate." Seminole Tribe, 517 U.S. at 59.

The Supreme Court clarified in 1996 that "Congress lacks power under Article I to abrogate the States' sovereign immunity in federal court." Alden v. Maine, 527 U.S. 706, 706 (1999) (citing Seminole Tribe, 517 U.S. 44). As such, Congress's power to abrogate immunity is typically—and constitutionally— employed in conjunction with legislation passed pursuant to the Fourteenth Amendment. See United States v. Georgia, 546 U.S. 151, 158-59 (2006) ("[N]o one doubts that § 5 grants Congress the power to enforce the provisions of the [Fourteenth] Amendment by creating private remedies against the States for *actual* violations of those provisions. Section 5 authorizes Congress to create a cause of action through which the citizen may vindicate his Fourteenth Amendment rights. This enforcement power includes the power to abrogate state sovereign immunity

by authorizing private suits for damages against the States." (emphasis in original) (internal quotations and citations omitted)); Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 305 (1997) (noting that "Congress may abrogate state immunity from suit in legislation enacted pursuant to § 5 of the Fourteenth Amendment").

Thus, any legislation Congress passes under its § 5 power that abrogates the States' sovereign immunity must have "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." City of Boerne v. Flores, 521 U.S. 507, 520 (1997); see also Kimel v. Florida Bd. of Regents, 528 U.S. 62, 82-83 (2000) ("Applying the same congruence and proportionality test in these cases, we conclude that the ADEA is not appropriate legislation under § 5 of the Fourteenth Amendment." (internal quotations omitted)). As such, when Congress enacted the Americans with Disabilities Act (ADA), it "invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment," and abrogated the States' immunity under the Eleventh Amendment for an ADA violation. United States v. Georgia, 546 U.S. 151, 154 (2006) (quoting 42 U.S.C. § 12101(b)(4)).

The Supreme Court has held that Congress's intent to abrogate the States' immunity in the ADA was "unequivocal" and that "insofar as Title II creates a private cause of action for damages against the States *for conduct that actually violates the Fourteenth Amendment*, Title II validly abrogates state sovereign

immigrant." <u>Georgia</u>, 546 U.S. at 159.[1]  In other words, a plaintiff may sue a State under Title II if the violation alleged is also a violation of the Fourteenth Amendment.  But there is a "growing fracture" among courts in the Southern District of New York in the approach taken to determine whether Congress's abrogation of state sovereign immunity under Title II is valid when there is no Fourteenth Amendment violation alleged.  <u>Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.</u>, 804 F.3d 178, 194 (2d Cir. 2015).

Pre-<u>Georgia</u>, the Second Circuit applied an approach articulated in <u>Garcia v. S.U.N.Y. Health Sciences Center</u>, which held "Congress had exceeded its section five authority in enacting Title II, but that Title II suits could be limited to circumstances in which it had not."  <u>Bolmer v. Oliveira</u>, 594 F.3d 134, 146 (2d Cir. 2010) (citing <u>Garcia v. S.U.N.Y. Health Sciences Center</u>, 280 F.3d 98 (2d Cir. 2001)).  In other words, "[s]ince the Equal Protection Clause only proscribes disparate treatment of the disabled that is not rationally related to a legitimate government purpose, Title II suits could be maintained against states only if the plaintiff showed that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability."  <u>Bolmer</u>, 594 F.3d at 146 (internal quotations omitted).

---

[1] The Court in this Opinion applies the same abrogation analysis for the Rehabilitation Act as it would for ADA Title II, as their standards are similar.  <u>Dean</u>, 804 F.3d at 187 ("As the standards for actions under these provisions of the ADA and the Rehabilitation Act are generally equivalent, we analyze such claims together." (citing <u>Harris v. Mills</u>, 572 F.3d 66, 73-74 (2d Cir. 2009))).  The abrogation provisions in each statute are similar, and the laws are valid under the same category of congressional authority.

Post-Garcia, though, the Supreme Court upheld Congress's abrogation under Title II in the context of courtroom accessibility, Tennessee v. Lane, 541 U.S. 509, 531 (2004), and in Georgia, which ultimately laid out a three-step process to determine whether Title II abrogation was constitutionally valid on a case-by-case basis:

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Georgia, 546 U.S. at 159. However, Georgia "explicitly left open the question of whether Congress may validly abrogate sovereign immunity with respect to a particular class of misconduct that violates Title II but does not violate the Fourteenth Amendment." Dean, 804 F.3d at 194. This "continued uncertainty . . . has led to a divergence in the approaches adopted by district courts," with some applying Garcia and others applying Georgia. Id. at 194-95.

But in either analysis, "if a plaintiff cannot state a Title II claim, the court's sovereign immunity inquiry is at an end." Mary Jo C. v. N.Y. State & Local Ret. Sys., 707 F.3d 144, 152 (2d Cir. 2013); see also Colon v. N.Y. State Dep't of Corr. & Cmty. Supervision, No. 15-cv-7432, 2017 WL 4157372, at *7 (S.D.N.Y. Sept. 15, 2017) ("Because the Court determines that Plaintiff has failed to allege a Title II violation, the Georgia inquiry is concluded, and the issue of sovereign immunity is

inapplicable.  Instead, Plaintiff's claims under the ADA and RA are dismissed for failing to state a claim.").

Congress has not, on the other hand, abrogated the states' immunity from suits filed under 42 U.S.C. § 1983, and neither states nor state officials in their official capacity are "suable persons" under § 1983.  Will v. Mich. Dept. of State Police, 491 U.S. 58, 64-65 (1989).  And while states can waive their own immunity from suit by statute or on a case-by-case basis, see Lapides v. Bd. of Regents, 535 U.S. 613, 618 (2002); Beaulieu v. Vermont, 807 F.3d 478, 483 (2d Cir. 2015), New York has not done so with respect to claims under New York common law, see Reaves v. City of New York, No. 98-cv-5708, 1999 WL 34757074, at *4 (S.D.N.Y. Sept. 30, 1999), aff'd, 213 F.3d 626 (2d Cir. 2000).  "For Eleventh Amendment purposes, [OPWDD] is to be considered an arm of New York State."  Komlosi v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 64 F.3d 810, 815 (2d Cir. 1995) (citing N.Y. Mental Hyg. Law § 13.01).

C.  Rehabilitation Act

Section 504 of the Rehabilitation Act provides in part:

> No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794 (emphasis added).  Section 504 was modeled on Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq.  See Marlow v. U.S. Dep't of

Education, 820 F.2d 581, 582 (2d Cir. 1987) (citations omitted) (explaining that "courts frequently construe section 504 with reference to Titles VI and IX" and that "in 1978, Congress amended section 505 of the Act, 29 U.S.C. § 794a(a)(2), to specify that the enforcement scheme of Title VI also governs section 504").

To state a claim under § 504, a plaintiff must allege "(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability." Davis v. Shah, 821 F.3d 231, 259 (2d Cir. 2016) (citing Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009); see also Harris v. Mills, 478 F. Supp. 2d 544 (S.D.N.Y. 20017) (stating the same elements).

As particularly relevant here, the plaintiff must state a plausible claim that she was excluded "based on [her] classification" as handicapped. Flight v. Gloeckler, 68 F.3d 61, 64 (2d Cir. 1995). "[A] plaintiff pleads an actionable claim of discrimination . . . under the ADA or the Rehabilitation Act if she alleges that the defendants made treatment decisions based on factors that are unrelated to, and thus improper to consideration of the inquiry in question." McGugan v. Aldana-Bernier, 752 F.3d 224, 234 (2d Cir. 2014) (citing Bolmer, 594 F.3d 134; United States v. Univ. Hosp., 729 F.2d 144 (2d Cir. 1984)). This is true not only in the medical treatment context, as with McGugan, but in all contexts.[2] 29 U.S.C. § 794.

---

[2] The parties here disagree over whether McGugan is applicable, as the alleged § 504 violation there was incompetent medical treatment that resulted from a stereotype of the mentally ill rather than a "medically appropriate, individualized assessment" of the plaintiff's condition. McGugan, 752 F.3d

"Deliberate indifference" may be enough to state a § 504 claim, but the plaintiff must also allege either "discriminatory animus or ill will," Garcia, 280 F.3d at 115, or an "*intentional* violation," Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 275 (2d Cir. 2009) (emphasis in original); see also Feltenstein v. City of New Rochelle, 254 F. Supp. 3d 647 (S.D.N.Y. 2017) (noting that to show that a defendant was "deliberately indifferent," plaintiff must show that defendant had "actual knowledge of the discrimination against Plaintiff that it failed to adequately address.")[3]

at 231. The Second Circuit noted its concern that allowing McGugan's claim to go forward would "federalize many (if not most) claims for medical malpractice." See id. at 234. Plaintiff contends that McGugan is distinguishable because there, proper medical treatment was withheld, while here, plaintiff alleges "failure to provide food, water, [and] basic hygiene." (Mem. in Opp. at 7.) Defendant's argument rests on a theory that McGugan held that there is "one narrow and discrete exception to the general rule that medical malpractice claims do not amount to discrimination under the Rehabilitation Act: a disabled plaintiff might state a claim for discrimination under Section 504 as a result of negligent medical care if her allegation is that the medical professional's "decision to administer (or to withhold) a treatment . . . was motivated by considerations that are unrelated to proper medical decision-making about the case." (Mem. in Supp. at 9 (citing McGugan, 752 F.3d at 232).) The Court agrees with defendant—McGugan (and Green v. City of New York, 465 F.3d 65, 78 (2d Cir. 2006), another case interpreted differently by the parties) stands for the broader proposition that a plaintiff must plausibly allege that defendants' actions were undertaken "on the basis of considerations that were 'unrelated to' or 'improper to consideration of'" her disability or that the defendant intentionally violated plaintiffs § 504 rights. McGugan, 752 F.3d at 234; see also Loeffler, 583 F.3d at 275.

[3] The parties also disagree on the relevance of K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist., 381 F. Supp. 2d 343, 360 (S.D.N.Y. 2005), to this case. K.M. held that "a school district's deliberate indifference to pervasive, severe disability-based harassment that effectively deprived a disabled student of access to the school's resources and opportunities would be actionable under Section 504 and Title II." Id. at 360. Plaintiff argues that this demonstrates that "deliberate indifference" can trigger a § 504 claim. (Mem. in Opp. at 8). That may be true, but plaintiff must simultaneously allege that the indifference was based on "discriminatory animus or ill will." Garcia, 280 F.3d at 115.

III.   DISCUSSION

A.  Rehabilitation Act (Claim I)

Plaintiff has not alleged that defendants' actions were improperly based on Panzer's mental disability.  As a result, plaintiff has not adequately plead a Title II violation.  Stating a claim that defendants were "grossly negligent" in their treatment of Panzer is not enough to satisfy Title II's requirement that the treatment was "solely by reason of" Panzer's disability.  Nothing in the Amended Complaint suggests to the Court that defendants denied Panzer "food, water, medical care, hygienic care, and basic human decency" because he was mentally disabled (versus, for instance, a very ill older man).  (Am. Compl. ¶ 2.)  While it may be the case that Panzer's disability "prevented him from demanding proper care," (id. ¶ 15), that is not enough to allege the treatment decisions were improperly based on discriminatory animus or that they were intentional, as required to meet the standard for "deliberate indifference."  See Garcia, 280 F.3d at 115; Loeffler, 582 F.3d at 275.  Plaintiff's statement that defendants were "deliberate[ly] indifferen[t]" does not suffice—on a motion to dismiss, plaintiff must do more than recite the legal standard.  See Iqbal, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting Twombly, 550 U.S. at 555)).

As such, the Court need not determine, as defendants request, whether the State receives Eleventh Amendment immunity under Title II as applied to this case.  Under either Georgia or Garcia, the first step of the analysis is dispositive if

12

plaintiff does not plausibly state a claim under Title II. This claim is thus DISMISSED for lack of subject matter jurisdiction.

### B. Section 1983 (Claims II and III)

As noted above, § 1983 claims cannot be brought against States or state officials in their official capacity, Will, 491 U.S. at 64-65, and OPWDD is considered an "arm of New York State," Komlosi, 64 F.3d at 815. As such, Claims II and III are DISMISSED as to OPWDD.

### C. New York Common Law Claims (Claims IV-VI)

Because the Court has dismissed Claims I-III as to OPWDD, it declines to exercise supplemental jurisdiction over the remaining state law claims against the agency, although it notes that OPWDD is likely immune under the Eleventh Amendment. See Reaves, 1999 WL 34757074, at *4; Komlosi, 64 F.3d at 815 (citing N.Y. Mental Hyg. Law § 13.01). The Court offers no opinion as to the strength of the common law claims if brought in state court.

## IV. PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

The Court notes that defendant's motions move to dismiss all claims as to OPWDD. In the absence of identification of the Doe Defendants, the Court would typically dismiss this case in full, as it could not properly establish whether it had personal jurisdiction over the remaining defendants. However, plaintiff has made a motion to amend the First Amended Complaint by adding named defendants and another common law claim. (ECF No. 19.) The Court will address that motion in a separate opinion once it is fully briefed.

13

V.     CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED in full.  Claim

I is dismissed in its entirety, and Claims II, III, IV, V, and VI are dismissed as to

defendant OPWDD.  The Clerk of Court is directed to close the motions at ECF Nos.

11 and 15.  This case remains open for consideration of plaintiff's pending motion to

amend the First Amended Complaint.

SO ORDERED.

Dated:        New York, New York
              November 3, 2017

_____
KATHERINE B. FORREST
United States District Judge